IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| SHERON POSTELL, ) | Civil Action No. 3:05-1936-MBS-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

In November 2001, Plaintiff applied for DIB. Plaintiff's application was denied initially and upon reconsideration. A hearing was held November 5, 2002 before an administrative law judge ("ALJ"). On April 1, 2003, the ALJ issued a decision, denying benefits. On February 19, 2004, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings. After a supplemental hearing held May 13, 2004, the ALJ issued a decision (dated July 15, 2004) denying benefits. The ALJ, after hearing the testimony of a vocational expert ("VE"), concluded that work exists in the national economy which Plaintiff can perform.

Plaintiff was fifty-three years old at the time of the ALJ's decision. She has a college education and past relevant work as a program assistant. Plaintiff alleges disability since August 23, 2001, due to problems with her back and hips (Tr. 94).

The ALJ found (Tr. 26-27):

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's pain in the pelvic area, both hips, low back, and right leg, severe reflux, irritable bowel syndrome, kidney problems, asthma, allergies, and tachycardia are considered "severe" impairments in combination based on the requirements in the Regulations 20 CFR § 404.l520(c).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix I, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not fully credible for the reasons set forth in the body of the decision.

6.  The claimant has the residual functional capacity for light unskilled work with a sit/stand option. She is not able to crawl, crouch, climb, squat, or kneel. She is not to be exposed to extremes of temperature or humidity or unusual dust, gases, or fumes. She is not to use the lower extremities for pushing or pulling. She is not to use the upper extremities for work above shoulder level.

7.  The claimant is unable to perform any other past relevant work (20 CFR § 404.1565).

8.  The claimant is an "individual closely approaching advanced age" (20 CFR § 404.1563).

9.  The claimant has "more than a high school education" (20 CFR § 404.1564).

10. The claimant has no transferable skills.

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule

202.14 as a framework for decision-making, and based on the testimony of the vocational expert, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as assembler/table worker and as a hand packer.

13.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

On May 17, 2005, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final action of the Commissioner.  Plaintiff filed this action on July 7, 2005.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972).  Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...."  See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

### DISCUSSION

Plaintiff's back impairment was treated by doctors of chiropractic at the Charleston Neck and Back Center from July 1999 to April 2002. Tr. 164-189.  She was treated again on June 30, 2003.  Tr. 233-234.

Plaintiff's back impairment was treated by Dr. Stephen E. Rawe, a neurological surgeon, from May 2001 to September 2002.  Tr. 135-149, 209-228.  On May 23, 2001, Dr. Rawe noted that Plaintiff had low back and right leg pain for more than ten years and that a previous MRI scan

apparently demonstrated a L4-5 disc protuberance. He noted that Plaintiff received chiropractic care and treatment with lumbar epidural steroid injections and nerve blocks. Dr. Rawe noted:

> Her main problem of low back and right leg pain is rather constant. The pain radiates down the posterior thigh to the calf but is not accompanied by any numbness or paresthesias. It is not aggravated by coughing. It will bother her in all positions, sitting, standing and walking[,] but is most aggravated in the walking position which does cause spasms of her low back.

Tr. 216. Dr. Rawe's neuromuscular examination revealed that Plaintiff had painful range of motion of the low back on forward bending, a limp of the right leg, positive straight leg testing on the right, and back pain on the left with straight leg raising. He opined that Plaintiff had findings consistent with lumbar radiculopathy. He ordered an MRI scan and prescribed a nerve root block. Tr. 134, 217.

Plaintiff underwent surgery on August 24, 2001. Tr. 135-149. Dr. Rawe noted prior to surgery that a "lumbar diskogram did result in reproduction of concordant pain at L5-S1 and also produced low-back pain at L4-5. She does have narrowing at the L5-S1 level which appears to be the symptomatic level." Tr. 139. Surgical intervention consisted of "[a]nterior lumbar interbody fusion, titanium cage fusion, [and] harvest of bone from left anterior iliac crest." Tr. 142. On September 20, 2001, one month post-surgery, it was noted that Plaintiff had some burning like pain in her right leg similar to what she had postoperatively, but it was much better. She had not worn a back brace and was taking Ibuprofen. It was noted that she had no obvious weakness or reflex in her lower extremities and straight leg raising and psoas stretch were negative. On October 22, 2001, Plaintiff complained of back and leg pain which she stated was unchanged from her pre-op status. Spine films on October 25, 2001 showed good position of the titanium cages with no obvious motion on flexion or extension views. Tr. 213.

4

On November 8, 2001, almost three months post-surgery, it was noted that Plaintiff complained of recurrent pain in her right lower extremity similar to what she experienced before surgery, but not as intense.  Examination revealed no obvious weakness or reflex abnormalities in her lower extremities, but she had a non-dermatomal hypalgesia involving the entire right lower extremity.  Straight leg raise testing was uncomfortable, but not positive. It was noted that recent myelogram and CT scan indicated good position of the anterior bone graft and cages and no finding to indicate any nerve root compression in the spinal canal.  Vioxx was prescribed.  Tr. 211.  When Plaintiff was last examined by Dr. Rawe on February 7, 2002, it was noted that she continued to be bothered by back, abdominal, and bilateral leg pain in the back of each thigh.  She had tenderness along the lumbar region, straight leg raising produced back pain, knee and ankle reflexes were 1+, and she had no sensory abnormalities.  Spine films indicated early fusion and no change in alignment on flexion or extension views with the titanium cages at L4-5.  Tr. 210.

On September 24, 2002, Dr. Rawe wrote a letter to Plaintiff's counsel in which he opined:

> Ms. Postell continues to have significant back and right leg pain to the point that she is able to stand, sit, and walk for only a limited amount of time.  It is my impression that this patient is completely impaired from any type of employment.  Although I was optimistic that the operative procedure which the patient underwent in August 2001 would alleviate her discomfort, it has not.  Further observation indicates that her pain remains basically unchanged.  The degree of her discomfort as well as the length of time she has had problems preceding her surgery indicate that most likely her condition is permanent.

Tr. 209.[1]

---

[1]Plaintiff, in her brief, has not challenged the ALJ's decision to discount this opinion of disability.

After her August 2001 surgery, Plaintiff did not return to her job of over twenty-nine years as a program representative at the South Carolina Employment Security Commission. She receives disability retirement benefits from the State of South Carolina. Tr. 281-282.

On December 14, 2001, Dr. George T. Keller, III, a State agency physician, reviewed Plaintiff's medical records and completed a Residual Functional Capacity ("RFC") Assessment. Tr. 154-163. Dr. Keller opined that Plaintiff had the functional RFC to occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry up to ten pounds, stand and/or walk for a total of six hours in an eight-hour workday, and sit for about six hours in an eight hour workday. He further opined that Plaintiff could only occasionally climb ramps and stairs and stoop, kneel, crouch, and crawl. Dr. Keller stated that Plaintiff could never climb ladders, ropes, or scaffolds.

On May 24, 2002, Plaintiff was examined by Dr. Douglas E. McGill, a physical medicine and rehabilitation specialist. 194-196. Dr. McGill noted that Plaintiff's back problems began in her thirties and she had undergone surgery in August 2001. Tr. 194. Plaintiff reported that she only took Ibuprofen for pain. Tr. 194. Dr. McGill's examination revealed that Plaintiff's had a slightly antalgic gait, 5/5 strength in all major muscle groups, and intact sensation throughout. Plaintiff had tenderness to palpitation in her lumbar spine, but no marked tenderness of her cervical spine, and range of motion of her hips did not produce pain. Dr. McGill assessed Plaintiff with a "[h]istory of lumbosacral spine disease with history of anterior fusion and discectomy." Tr. 195. He restricted Plaintiff from heavy or repetitive lifting and from lifting from the floor to overhead levels. Additionally, Dr. McGill restricted Plaintiff from repetitive bending or twisting and from prolonged sitting, standing, or walking. Tr. 196.

On June 13, 2002, Dr. Joseph I. Gonzalez, a State agency medical consultant, reviewed Plaintiff's record and completed a physical residual functional capacity assessment. Tr. 198-208.

Dr. Gonzalez concluded that Plaintiff was capable of the exertional demands of light work; she could occasionally climb, balance, stoop, kneel, crouch, and crawl; and she had no manipulative, visual, communicative, or environmental limitations.

Plaintiff was treated by Dr. Marc N. Dubick, a pain management specialist, from June 2002 to July 2003. Tr. 229-249. Dr. Dubick prescribed physical therapy and injections. On July 14, 2003, Dr. Dubick opined that Plaintiff appeared to have a primary structural dysfunction causing her pain and noted that Plaintiff rejected his recommended next step of prolotherapy/regenerative injection therapy. He stated that Plaintiff could return on an as needed basis. Tr. 232.

On November 5, 2002, Plaintiff had a lumbar CT myelogram which revealed post-fusion changes at L4-5. There was very minimal disc bulge at L3-4 with no disc herniation, spinal canal stenosis, or foraminal narrowing identified. Tr. 152-153.

Plaintiff was treated by Dr. Donald R. Johnson, II and G. Robert Richardson, III, physicians at the Southeastern Spine Institute, from April to August 2004. Tr. 250-256, 259-273. An MRI of Plaintiff's lumbar spine was performed on April 26, 2004. The overview of the lumbar spine showed normal bony alignment and normal marrow signal with no evidence of congenital anomaly of the spine. Images of her hips, sacroiliac joints, piriformis muscles, and proximal sciatic nerves revealed no abnormality. There was transitional segmentation with pseudoarthroses bilaterally at the lumbosacral junction and a complete disc at S1-2. Views of Plaintiff's distal thoracic spine showed a normal spinal cord and conus medullaris, normal vertebrae, and no evidence of abnormal discs. At L4-5 there was facet arthropathy and mild listhesis with a diffuse bulge of disc material which resulted in moderate bilateral recess stenosis. At L5-S1 there was evidence of an interbody fusion with cage prostheses. Tr. 252-253. On May 3, 2004, Dr. Johnson noted that the MRI revealed that the level above the previous cage fusion had some protrusion and mild to moderate

stenosis, but he did not suggest surgical intervention and he thought she was a good candidate for

selective injection.  Plaintiff underwent a cervical MRI on May 6, 2004, which revealed moderate

degenerative disc disease of Plaintiff's cervical spine which was most marked at C4-5 and C5-6

where moderate disc protrusions were seen, mildly contracting, but no compressing or displacing

the spinal cord.  There were varying degrees of moderate to moderately severe foraminal stenosis

at several locations.  Tr. 255-256.[2]  Numerous lumbar epidural injections were performed.  An EMG

and Nerve Conduction Study on August 12, 2004 (Tr. 262-267) was normal with "no evidence to

suggest a cervical or lumbar radiculopathy" and "no evidence to suggest a peripheral neuropathy or

peripheral nerve injury."  Tr. 262.  On August 30, 2004, Dr. Richardson noted that Plaintiff had

normal strength throughout, her reflexes were symmetrical, and she had diffuse lumbar paraspinal

tenderness and spasm.  He noted that Plaintiff was taking Vioxx and Tylenol, opined that they were

running out of treatment options for her, gave her samples of the Lidoderm Patch as well as

Skelaxin, and stated she could return to see them on a per needed basis.  Tr. 259.[3]

At the first hearing, Plaintiff testified that she had constant pain and numbness in her back

and right leg, with pain stretching across the pelvic area into both hips.  She stated that she was

unable to bend and had difficulty sitting and standing due to back pain.  Plaintiff reported that she

was able to stand for twenty minutes and sit for twenty minutes and she elevated her legs five to six

---

[2]Contrary to Plaintiff's assertion, the ALJ did not ignore the results of the May 6, 2004 cervical MRI, which was done separately from the April 2004 MRI of Plaintiff's thoracic spine.  See Tr. 21. 24.  Plaintiff did not allege problems with her cervical spine in her disability application and there is no indication of any treatment for this problem or that it lasted for a continuous period of at least twelve months.

[3]Although the ALJ found that Plaintiff also had the severe impairments of severe reflux, irritable bowel syndrome, kidney problems, asthma, allergies, and tachycardia, which are noted in the histories of several of the physicians above, there are few actual treatment notes in the record concerning these impairments.

8

times per day.  She went to physical therapy three days a week.  Plaintiff stated that she required

breaks while completing tasks during the day.  Although she had back and leg pain, she indicated

she was able to drive a Chevy Tahoe.  Plaintiff indicated on January 18, 2002, that she had last

received care from her physician on November 8, 2001.  See Tr. 47, 284-288.

At the supplemental hearing, Plaintiff testified that she was not able to work due to problems

with her back, hips, spine, thyroid, reflux, vertigo, tachycardia, asthma, and allergies.  She

complained of numbness in her right leg and asserted that she was in pain all the time from her neck

down to her toes.  Plaintiff indicated that her thyroid problem caused extreme fatigue; she had reflux

twenty-four hours a day which burned her larynx and caused pain in her colon; she had diarrhea

from taking Vioxx and Nexium; she had severe cystitis of her kidneys; she experienced vertigo two

to three times a week and had to lie down; and she had to avoid chemicals, tobacco, and situations

that caused asthma attacks.  Plaintiff asserted that she was only able to stand and/or sit for twenty

to thirty minutes at time.  She stated that her non-exertional pain made it hard to concentrate.

Plaintiff testified that a normal day involved getting up at 7:00 a.m., it took her two hours to get

going, she walked or went to an appointment and then had to lay down, she went to her chiropractor

once a week, she went to a lot of doctor's appointment, she took her father (who was in the last

stages of COPD) to appointments, she had to lie down four to five times a day, and if she cooked

or vacuumed she had to lie down to rest.  Tr. 19, 310-319.

In her brief, Plaintiff's only allegation is that the ALJ erred in evaluating her credibility.

Specifically, she claims that the ALJ's opinion is not supported by her activities of daily living and

the sections of the record cited by the ALJ do not support his decision.  The Commissioner contends

that the ALJ's decision is supported by substantial evidence.[4] Specifically, the Commissioner argues

that the ALJ's decision demonstrates that he properly weighed the medical evidence, as well as the

nonmedical evidence of record including Plaintiff's testimony, before finding her allegations were

not fully credible.

In assessing credibility and complaints of pain, the ALJ must: (1) determine whether there

is objective evidence of an impairment which could reasonably be expected to produce the pain

alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints of

pain, along with all of the evidence in the record. See Craig v. Chater, 76 F.3d 585, 591-92 (4th Cir.

1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994). Although a claimant's allegations about pain

may not be discredited solely because they are not substantiated by objective evidence of the pain

itself or its severity, they need not be accepted to the extent they are inconsistent with the available

evidence, including objective evidence of the underlying impairment, and the extent to which the

impairment can reasonably be expected to cause the pain the claimant alleges he suffers. A

claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the

extent that alleged functional limitations are reasonably consistent with objective medical and other

evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

---

[4]Substantial evidence is:

> evidence which a reasoning mind would accept as sufficient to support a
> particular conclusion. It consists of more than a mere scintilla of evidence
> but may be somewhat less than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the case before a jury, then there is
> "substantial evidence".

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th
Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established
exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

Here, the ALJ found that Plaintiff was not fully credible concerning the severity of her symptoms and extent of her limitations. The ALJ, however, did credit Plaintiff's complaints of pain to the extent he found her pain limited her to unskilled, light work with a stand/sit option. He also found that her pain limited her to work that did not require her to crawl, crouch, climb, squat, or kneel; did not expose her to extremes of temperature or humidity; did not exposure her to unusual dust, gasses, or fumes; did not require her to use her lower extremities for pushing or pulling; and did not require her to use her upper extremities for work about her shoulder level.[5] See Tr. 27. In reaching this conclusion, the ALJ took into account Plaintiff's daily activities, the medical notes, her pain medication usage, and inconsistencies in the record.

The ALJ's finding concerning Plaintiff's pain and credibility is supported by substantial evidence. First, the decision is supported by the medical record. As noted by the ALJ, treating physician Dr. Johnson did not place any limitations on Plaintiff. Tr. 24. Dr. McGill found that Plaintiff had 5/5 strength in all major muscle groups, intact sensation throughout, and her range of motion of her hips did not produce pain. Tr. 195. He restricted her from heavy or repetitive lifting; lifting from the floor to overhead levels; repetitive bending or twisting; and prolonged sitting, standing, or walking. Tr. 196. Although the ALJ stated that he did not accord Dr. McGill's opinion significant weight (Tr. 23), Dr. McGill's findings were consistent with the ALJ's finding that

---

[5]As the exertional requirements of Plaintiff's past work exceeded her RFC, the ALJ found that Plaintiff was unable to perform her past relevant work. Tr. 27. The ALJ posed a hypothetical question to the VE in which he asked the VE to consider an individual of Plaintiff's age, education, and work experience who had the RFC to perform light work with a sit/stand option. He imposed the postural limitations of no crawling, crouching, climbing, squatting, or kneeling; lower extremity limitations such that there would be no use of the legs or feet for pushing or pulling of foot or leg controls; upper extremity limitations so there would be no use of the arms for work above shoulder level; environmental restrictions so there would be no exposure to unusual dust, gases, or fumes; and no exposure to extremes of temperature or humidity. Tr. 320-321. In response, the VE identified the unskilled, light jobs of assembler and handpacker. Tr. 321-322.

Plaintiff had the RFC for light work with a sit/stand option.  The opinion of an examining physician

can constitute substantial evidence in support of the ALJ's decision.  See Wilkins v. Secretary of

Dep't of Health & Human Serv., 925 F.2d 769, 776 (4th Cir.1991), rev'd on other grounds, 953 F.2d

93 (en banc),  The ALJ also properly gave "some weight" to the opinion of the non-examining State

agency physicians who reviewed the record and concluded that Plaintiff was capable of performing

a range of light work.  See 20 C.F.R. §§ 404.1527(f)(2) and 416.927(f)(2); SSR 96-6p ("Findings

of fact made by State agency ... [physicians ]... regarding the nature and severity of an individual's

impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals

Council level of administrative review.").

        Objective medical evidence also supports the ALJ's decision to find Plaintiff only partially

credible.  An MRI in November 2002, showed only surgical changes and a very minimal disc bulge

at C3-4 with no disc herniation.  Tr. 152-153.  The MRI of Plaintiff's lumbar spine in April 2004

showed the previous interbody fusion at L5-S1 and facet anthropathy and moderate bilateral recess

stenosis at L4-5, but images of Plaintiff's hips, sacroiliac joints, piriformis muscles, and proximal

sciatic nerves revealed no abnormality.  Tr. 252-253.  EMG and nerve conduction studies in August

2004 were normal.  Tr. 262-267.

        Other evidence in the medical record also support's the ALJ's decision.  In August 2002,

Plaintiff was discharged from aquatic therapy after twelve visits.  The physical therapist noted

Plaintiff had met her goals for strength and mobility.  Tr. 248.  In September 2002, Plaintiff began

land-based physical therapy, and at the initial evaluation the therapist noted Plaintiff used a cane and

had a back brace, but was advised by her physician not to wear the brace due to strength loss

concerns. Tr. 246; see also Tr. 123.  Plaintiff continued in physical therapy until discharged on June

10, 2003, when she was instructed to continue her home exercise program, aquatic exercise, and chiropractic care as needed.  Tr. 235.

The ALJ's decision is also supported by Plaintiff's activities of daily living.  Although she testified that she had to lie down to rest afterwards, Plaintiff was able to cook and vacuum.  See Tr. 318.  Plaintiff drove herself and her father to numerous appointments. Tr. 317-318.  Dr. Richardson noted on August 30, 2004 that Plaintiff had been diligent with her walking program and felt overall her strength had improved.  Tr. 259.

Despite Plaintiff's allegations of disabling pain, she only took over-the-counter and nonsteroidal anti-inflammatory medications for long periods of time to control her pain.  See, e.g., Shively v. Heckler, 739 F.2d 987, 990 (4th Cir. 1984) (expressing approval of ALJ's consideration of a plaintiff's lack of strong pain medication); see also 20 C.F.R. § 404.1529(c)(3)(listing "other evidence" to be considered when "determining the extent to which [claimant's] symptoms limit [claimant's] capacity for work," including, "(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms[.]").  Plaintiff told Dr. McGill in May 2002 that she took only over-the-counter Ibuprofen for pain.  Tr. 194.  In November 2002, Plaintiff listed only Motrin for pain.  Tr. 131.  In April 2004, she reported to Dr. Johnson that she was only taking Vioxx and Tylenol Arthritis for pain.  Tr. 250.  She reported to Dr. Johnson that she tried her best not to use narcotics.  Tr. 250.

## CONCLUSION

Despite Plaintiff's claims, she fails to show that the Commissioner's decision was not based on substantial evidence.  This Court may not reverse a decision simply because a plaintiff has

produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson v. Perales, supra.  Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock v. Richardson, supra.  The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion.  Shively v. Heckler, supra.  It is, therefore,

RECOMMENDED that the Commissioner's decision be affirmed.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

February 12, 2007
Columbia, South Carolina

14